AMY KARLIN (Bar No. 150016)
Interim Federal Public Defender
Melissa Austen (Bar No. 321897)
(E-Mail: melissa_austen@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
FERNANDO FLORES

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>FERNANDO FLORES,<br>Defendant. | Case No. 2:25-cr-00646-MEMF<br><br>**DEFENDANT'S SENTENCING POSITION; EXHIBITS A-N**<br><br>Sentencing Date: September 23, 2026, at 10:00 a.m. |

Defendant Fernando Florez, through counsel of record, Deputy Federal Public Defender Melissa Austen, hereby submits his position regarding sentencing.

Respectfully submitted,

AMY KARLIN
Interim Federal Public Defender

DATED: September 9, 2026 By */s/ Melissa Austen*

MELISSA AUSTEN
Deputy Federal Public Defender
Attorney for Fernando Flores

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........ 1

II. ARGUMENT ........ 3

A. The Presentence Investigation Report Correctly Calculates the Guidelines Range ........ 3

B. Factual Clarifications to the Presentence Investigation Report ........ 3

C. Objection to Appended JSIN Data as Unreliable and Misleading in This Case ........ 5

D. Objections to the Probation Office's Recommended Supervised Release Conditions ........ 6

1. Proposed Condition #2: Up to Eight Drug Tests Per Month ........ 7

2. Proposed Condition # 3: Outpatient Substance Abuse Treatment ........ 8

3. Proposed Condition #4: Residential Drug Treatment ........ 9

4. Proposed Conditions #11 & 12: Gang Association and Gang Territory ........ 10

E. Applying the § 3553(a) Factors, a Time Served Sentence is Appropriate ........ 11

1. Mr. Flores Grew Up in a Violent Home Where Healthy Communication Was Not Modeled ........ 11

2. Mr. Flores Developed a Drug Addiction While Seeking Guidance and Belonging in the Neighbourhood Gang at Age Thirteen ........ 12

3. Mr. Flores Took Responsibility for Crimes He Committed Throughout His Teens and Early Twenties ........ 13

4. Mr. Flores Reformed in Prison and Stayed Out-of-Custody for Sixteen Years Until His Arrest in This Case ........ 14

a. Mr. Flores Apologized To His Sister Jessica and Became a Dependable Support to Her ........ 14

b. Mr. Flores is a Loving Father to Three Kids ........ 15

c. Mr. Flores Learned Healthy Communication Skills From Treatment and Takes Care of His Entire Family and Community ........ 20

d. Mr. Flores Has Held Consistent Employment Since His Release From Prison ........ 21

5. The Offense is Aberrant to Mr. Flores' Character and the Conduct Was Relatively Minor ........ 21

# TABLE OF CONTENTS

Page


6. Mr. Flores is Remorseful and Demonstrated Significant Insight Into His Offense Conduct ..... 23

7. Mr. Flores Still Receives Mental Health and Relapse Prevention Therapy ..... 24

8. Parity With Other Cases ..... 24

9. The Appropriate Sentence ..... 25

III. CONCLUSION ..... 26

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*United States v. Kent*,
209 F.3d 1073 (8th Cir. 2000)....................9

*United States v. Stephens*,
424 F.3d 876 (9th Cir. 2005)....................7, 9

**Federal Statutes**

18 U.S.C. § 111(a)(1)....................3, 22

18 U.S.C. § 3553(a)....................*passim*

18 U.S.C. § 3561(c)(2)....................4

18 U.S.C. § 3572(a)....................26

18 U.S.C. § 3583(d)....................7, 8, 10

U.S.S.G. § 5B1.1 n.3....................26

U.S.S.G. § 5D1.1(b), and a....................25

USSG § 2A2.4(b)(1)(A), and a 2-level....................3

USSG § 3E1.1(a)....................3

**Other Authorities**

(Aug. 18, 2025), available at https://www.hrw.org/news/2025/08/18/us-excessive-force-against-la-protesters....................23

(June 10, 2026), available at https://www.independent.co.uk/bulletin/news/kristi-noem-los-angeles-immigration-b2767302.html....................1

Fed. R. Crim P. Rule 32....................5

Fox 11, "Mother of 5 Killed By Suspected Drunk Driver in Pacoima Crash" (July 8, 2026)....................8

## I. INTRODUCTION



Mr. Flores at Glovis America with his prison ID

Fernando Flores is a forty-one-year-old United States citizen born to two Mexican immigrants. Ms. Flores was, and is, acutely aware of the heartbreaking paradox of integration: the United States reserves the power to withhold the very belonging immigrants' sacrifices seek to secure. This integration paradox came to the forefront of Los Angeles culture during the inaugural ICE raids of summer 2025. Then and now, ICE officials profiled, stalked and seized predominantly Latino people they suspected lacked authorization to be in the country. The Trump Administration sought to recast Los Angeles from what Mayor Karen Bass affectionately referred to as a "city of immigrants" into a dangerous "city of criminals" requiring liberation.[1] Mr. Flores' decision to join the anti-ICE protest on July 23, 2025, was deeply personal. Raised in a Mexican-American immigrant family, Mr. Flores felt a moral duty to speak out against the systemic dehumanization and removal of Mexican and Latino people.

---

[1] Mike Bedigan, Independent, "Kristi Noem Says LA is a 'City of Criminals' Over Immigrant Protection" (June 10, 2026), available at https://www.independent.co.uk/bulletin/news/kristi-noem-los-angeles-immigration-b2767302.html.

While protesting, Mr. Flores mistook the victim in this case, Metropolitan Detention Center ("MDC") officer A.M., for an ICE officer. This mistake does not excuse Mr. Flores' conduct. It does, however, lend context. He entered an extraordinarily volatile setting--one where judgment could fail in a moment and only afterward reveal how far it had given way.

The offense conduct itself is relatively minor. For a split-second, Mr. Flores grabbed A.M.'s bag, causing her to step back. Mr. Flores stood back as A.M. and her colleagues continued walking. No hand was laid on A.M.'s person. There was no injury. Yet, appropriately, the incident deeply troubles Mr. Flores. For Mr. Flores, the incident marks a serious lapse in the character he cultivated so diligently over the past sixteen years.

When Mr. Flores was released from prison in 2009, he made a promise to himself that he would never again commit a crime that could hurt another person.[2] For the past sixteen years, Mr. Flores carried his old prison ID in his wallet. It is a reminder of the life he resolved to leave behind. And did. Mr. Flores sought treatment for his drug addiction. He engaged in therapy, and continues with this today. He built a loving family. He became a hands-on dad. He has consistently worked fulltime; he cares for his elderly parents, siblings and friends. Mr. Flores takes great pride in familial and work responsibilities--ordinary things that are easy to take for granted but that, for Mr. Flores, represent sixteen years of sustained change. For sixteen years, Mr. Flores did not return to the criminal conduct that had once defined his life. He kept his promise. Then came this case.

Mr. Flores understands that accepting responsibility means more than acknowledging his mistake. This case confronted Mr. Flores with the fact that his rehabilitation work is never done. Since this charge, Mr. Flores completed additional

---

[2] Mr. Flores received two misdemeanor convictions related to his then-drug addiction within a year of his release from prison: possession of drug paraphernalia and possession of marijuana. PSR¶¶56-57. Mr. Flores had no further convictions until this case.

inpatient and outpatient drug treatment. He processed the offense conduct in therapy. He wrote an insightful, sincere apology letter to A.M. He pled guilty.

The defense disagrees with the Probation Office's recommendation of an additional three months' jail time. A custodial sentence, even if brief, would jeopardize Mr. Flores' fulltime job and his ability to support his children, parents and siblings. All § 3553(a) factors weigh against further jail time. Given the rehabilitative work Mr. Flores completed upfront since the charge in this case, a time served sentence is appropriate but not greater than necessary.

## II. ARGUMENT

### A. The Presentence Investigation Report Correctly Calculates the Guidelines Range

The PSR correctly concludes, as the parties stipulated in the plea agreement, that the Base Offense Level is 10 under USSG§ 2A2.4, a 3-level increase applies for physical contact under USSG § 2A2.4(b)(1)(A), and a 2-level reduction applies for acceptance of responsibility under USSG § 3E1.1(a). Based on a total offense level of 11 and a Criminal History Category I, the PSR calculates the guideline range to be 8 to 12 months, factoring in the 12-month statutory maximum sentence for 18 U.SC. § 111(a)(1), a Class A misdemeanor.

### B. Factual Clarifications to the Presentence Investigation Report

Mr. Flores makes the following factual clarifications and objections to the Presentence Investigation Report.

*First*, after the PSR was filed, Mr. Flores' bench warrant in Los Angeles County Superior Court of California case 1TR01440 was recalled and quashed on May 26, 2026. The Minute Order is attached hereto as **Exhibit A**; *see* PSR at pg.1.

*Second,* Mr. Flores's bench warrant in Las Vegas Township County case number 24-CR-018065 was recalled and quashed on September 9, 2026. The Minute Order is forthcoming.

*Third,* Mr. Flores denies shoving A.M. PSR¶20. This allegation does not form part of the factual basis in the plea agreement. Dkt. 30¶9. Nor does A.M.'s cellphone video of the incident, provided in the discovery and appended as **Exhibit B**, show a shove.

*Fourth,* Mr. Flores and his longtime partner, Adriana Morales, reconciled and are engaged. Mr. Flores and Stephanie Sandoval are no longer in a relationship and Ms. Sandoval miscarried the baby they were expecting. PSR¶¶83-86.

*Fifth,* the PSR's claim that Mr. Flores is not amenable to substance abuse treatment requires clarification. PSR¶104. This claim could be misconstrued to imply that Mr. Flores has been unwilling to participate in treatment, which would be incorrect. During the pretrial stage of this case, Mr. Flores completed a 90-day outpatient substance abuse treatment program through Canon Human Services. PSR¶103; *see* letter of Walter Raudales at Canon Human Services, dated November 28, 2025, appended as **Exhibit C**. In addition, on his own volition and without any court order or Pretrial Services recommendation, Mr. Flores completed a four-month outpatient substance abuse program at Asian American Drug Abuse Program ("AADAP"). Jacob Reyes, an outpatient counselor for AADAP, confirms Mr. Flores' program completion in his letter of August 20, 2026, appended as **Exhibit D**.

Given that Mr. Flores recently graduated from an outpatient program, which included developing a relapse prevention plan, a court ordered program is unnecessary. There is nothing on the record, such as post-program relapse, to support ordering another program. If further supervision is ordered, the Probation Office will monitor Mr. Flores for relapse, including through drug testing. If any future concern arises, the Probation Office can bring it to the Court's attention and seek a modification.

*Sixth,* the PSR is correct that the maximum probation period in this case is five years, pursuant to 18 U.S.C. § 3561(c)(2). PSR¶130. The PSR omits an important detail: no probation period is statutorily required for this offense. *Id.*

**C. Objection to Appended JSIN Data as Unreliable and Misleading in This Case**

The defense objects to the inclusion in the Presentence Report of data from the Judiciary Sentencing Information (JSIN) database. PSR¶¶141-143. This data is insufficiently reliable for the Court to consider. Such statistical information is not listed in the Federal Rule of Criminal Procedure 32 or in Monograph 107 as one of the items that must be included in a Presentence Report. More importantly, while properly conducted statistical analysis may be quite relevant to sentencing in certain cases, the data presented in this case is skewed upward and misleading. JSIN provides aggregate statistics for all defendants that fall in a particular guidelines cell (offense level and criminal history), but the offenders included in this cell are not necessarily similar and there is no way to determine in which ways they are similar and dissimilar. For example, the JSIN data is not filtered to parse misdemeanor conduct (charged here) from more serious felony offense conduct. Yet the PSR describes the JSIN sentencing data here as "comparative," implying it is reliably applicable to defendants similarly situated to Mr. Flores. *Id.* That description is incorrect for several additional reasons:

- The JSIN data includes only "length of imprisonment" rather than "sentence length." "When Commission publications refer to 'average sentence', usually both alternative months of confinement as well as sentences of probation are included… However, when Commission documents refer to 'average length of imprisonment,' usually only prison sentences are included." Appendix B, USSC Codebook FY99-FY21. As a result, both probationary sentences and alternative confinements are excluded, skewing the results upward.
- The JSIN accounts for "time served" sentences differently than probationary sentences, treating the number of months served prior to sentencing as the sentence intended by the judge, even if the intent of the judge was to impose a noncustodial sentence.

- Sentences with a 5K1.1 departure are excluded. This skews the data away from 0, when the underlying conduct is arguably similar.
- Career offenders and defendants facing mandatory minimums are automatically included.
- JSIN gives no analysis of what number of defendants is sufficient. The number of defendants in this case may be sufficient for reliable results, but no analysis is provided to support that finding.
- The data here includes national results. Due to regional differences, for example in how state cases enhancing the federal guideline range are prosecuted, data from this district as well as form the Ninth Circuit should be included if any statistics are considered.
- The data presented here only includes the last five years. It should include all available data, going back at least ten years.
- JSIN "averages" omits information on where sentences fall within the guideline range. There is nothing inherently wrong with an average as a standalone descriptive statistic. But statistics are not neutral. It is only natural to project onto a statistic certain assumptions about a group of similarly situated defendants.

For the reasons noted above, the data is skewed upward in a way that cannot be accounted for. This data's inclusion in the report is misleading and contrary to an individualized assessment of defendants to be sentenced, as required under 18 U.S.C. § 3553(a) and the Due Process Clause. For these reasons, the Court should not place much weight (if any at all) on the JSIN data presented in the PSR in this case.

### D. Objections to the Probation Office's Recommended Supervised Release Conditions

A time served disposition is appropriate. However, if the Court disagrees and imposes a period of supervised release, Mr. Flores objects to the following conditions recommended by the Probation Office.

**1. Proposed Condition #2: Up to Eight Drug Tests Per Month**

Mr. Flores does not object to drug testing, but a testing frequency "not to exceed eight tests per months" is excessive compared to his pretrial testing regimen. Dkt. 37 at p. 2. The defense requests the condition be modified so that drug testing not exceed four tests per month.

For the past year, Mr. Flores has driven about three times per month at 5:00 a.m. to Detection & Treatment Resources ("DTR") in Inglewood to drug test. He then drives about one hour from DTR to his work at Glovis America in Compton. This month (September 2026), Mr. Flores' testing frequency was reduced to about two times per month. Probation has not explained why anything less than up to eight tests per month would be inadequate to monitor Mr. Flores. An option for weekly testing seems sufficient but not greater than necessary to monitor for relapse.

The proposed monthly eight tests cap would be unduly financially burdensome. Mr. Flores pays a $40 copay for each test at DTR. PSR¶119. $320 monthly for eight tests would eat up almost half of Mr. Flores monthly cash flow (about $736). PSR¶114. Mr. Flores provides financial support to his daughter, his parents, and his sister Blanca and her children. PSR¶82. Even without the expense of eight monthly tests, the PSR found that Mr. Flores has "minimal assets" and does not appear to have the ability to make payments towards a financial sanction. PSR¶130.

The district court, not the probation officer, must decide the maximum number of non-treatment-program drug tests to which a defendant may be subjected. *United States v. Stephens*, 424 F.3d 876, 883 (9th Cir. 2005) (holding the district court erred when it failed to state the maximum number of non-treatment drug tests the probation officer could impose. This delegation of the court's statutory duty was impermissible.) Congress's inclusion in 18 U.S.C. § 3583(d), the supervised release provision, of the drug testing requirement and the parenthetical provision, "as determined by the court," as well as its provision that the drug testing condition may be "ameliorated or suspended by the court," is without question a plain expression of its intent that courts

themselves determine not only whether the defendant will be tested during supervised release, but the maximum number of tests as well.

**2. Proposed Condition # 3: Outpatient Substance Abuse Treatment**

The defense objects to outpatient drug treatment as a condition of supervised release. The PSR was filed on April 8, 2026, before Mr. Flores enrolled in and successfully completed the outpatient Asian American Drug Abuse Program ("AADAP") between April 27, 2026, and August 20, 2026. The Probation Officer was unaware that Mr. Flores completed AADAP until recently because outpatient treatment was neither recommended by Pretrial Services nor ordered by the Court. Mr. Flores decided on his own to enroll in the program after his positive drug test in March 2026.[3]

A letter from Jacob Reyes, AADAP's Outpatient Counselor, explains that Mr. Flores participated in 55 substance use disorder groups, 21 individual counselling sessions, and returned all (thirteen) negative drug tests. Exhibit D. Mr. Reyes' letter explains that Mr. Flores "has shown strong resilience and commitment to his sobriety in light of recent family tragedy." *Id.* The tragedy referred to took place on July 7, 2026, when Mr. Flores' sister, Jessica Flores, was killed by a drunk driver. *See* Fox 11, "Mother of 5 Killed By Suspected Drunk Driver in Pacoima Crash" (July 8, 2026), appended as **Exhibit E**. AADAP's outpatient program typically lasts three months, but when Mr. Flores learned the news of his sister's death, he elected to stay in the program for an additional month. If any event was likely to test Mr. Flores' sobriety, it was the sudden violent death of his sister. Yet Mr. Flores recognized that risk and responded proactively by electing to remain in the program until he felt equipped to process his loss without relapsing. Mr. Flores' conduct demonstrates insight into his addiction, a willingness to seek help when necessary, and a steadfast commitment to sobriety. Court-ordered treatment is unnecessary.

---

[3] Mr. Flores' Pretrial Services Officer did not recommend outpatient drug treatment after the March 2026 dirty test. Instead, she recommended a journalling program as sufficient to address the dirty test. Mr. Flores completed the journalling program under his Pretrial Services Officer's direction.

Moreover, further treatment would likely interfere with Mr. Flores' work and familial commitments. Mr. Flores' work hours at Glovis America are 8:00 a.m. until 4:30 p.m. Monday to Friday. He often does not leave work until 7:00 to 7:30 p.m. Mr. Flores spends most evenings with his daughter, including helping with homework. On most weekends before his sister's death in July 2026, Mr. Flores also worked at Associated Recycling Pallets. *See* Daniel Gomez's letter of February 17, 2026, appended as **Exhibit F**. Mr. Flores chose to take a temporary leave of absence from Associated Recycling Pallets to help his sister Blanca care for his infant nephew Noah, but will return to the job in the future.[4] *See* letter of Blanca Flores, attached as **Exhibit G**. Mr. Flores also drives his mother to medical appointments and takes care of both of his parents, with whom he lives. Mr. Flores is focused on being a provider and caretaker; these roles give him purpose and disincentivize relapse.

**3. Proposed Condition #4: Residential Drug Treatment**

Mr. Flores objects to the proposed condition that the Probation Officer, with agreement of Mr. Flores and his counsel, may place Mr. Flores in a residential drug treatment program with counseling and testing. This proposed condition is improper because it does not require a judicial determination as to whether Mr. Flores participate in residential treatment. *United States v. Stephens*, 424 F.3d 876, 880 (9th Cir. 2005) (holding that it would be an improper delegation of Article III judicial authority to allow the probation department to determine whether a defendant should participate in treatment); *see also United States v. Kent,* 209 F.3d 1073, 1079 (8th Cir. 2000) (court's order that if counseling "becomes necessary" probation officer may determine whether defendant must participate, was inconsistent with Article III because punishment is a judicial function, and the guidelines state that the court may impose that condition).

---

[4] Jessica Flores, the sister who was recently killed in July 2026, was Noah's mother.

The defense and the Probation Officer can coordinate any residential treatment, should there be a need, down the road without this condition.

**4. Proposed Conditions #11 & 12: Gang Association and Gang Territory**

The proposed conditions that Mr. Flores not associate with Pacoima Trece or Pacoima 13 gang members, or be present in locations where these gangs assemble, are not related to the criminal conduct or Mr. Flores' circumstances. Mr. Flores has not been a gang member since his teenage years. He is now age forty-one. There is nothing in the record to suggest the contrary. These proposed conditions are not reasonably related to the goals of deterrence, protection of the public, or rehabilitation, as 18 U.S.C. § 3583(d) requires.

Should the Court disagree, Mr. Flores requests an exception to proposed condition #12. As Mr. Flores' sister Marisol Flores explains in her letter, she resides in Pacoima, CA, with her sons Joshua and Anthony. **Exhibit H**. Marisol's residence could be considered to be within the territory of these gangs. Mr. Flores helps his sister with childcare and seeks an exception to travel to and from her residence without needing to check in with probation, especially should there be a family emergency. Counsel recently spoke with Probation Officer Jessica Mendez, who, the defense understands, would like to keep proposed conditions #11 and 12, but is agreeable to this exception. The proposed revised language is as follows:

> As directed by the Probation Officer, the defendant shall not be present in any area known to the defendant to be a location where members of the Pacoima Trece Gang or Pacoima 13 gang meet or assemble, except to travel to and from his sister Marisol Flores' residence located at XXXX, Pomona, CA, XXXX.[5]

---

[5] The precise address will be provided to the Court at sentencing to comport with Local Rule 49-1.

**E. Applying the § 3553(a) Factors, a Time Served Sentence is Appropriate**

Taking into account Mr. Flores' history and characteristics, the nature and circumstances of the offense, and the kinds of sentences available, a time served sentence is appropriate.

**1. Mr. Flores Grew Up in a Violent Home Where Healthy Communication Was Not Modeled**

Mr. Flores was born in Los Angeles to two parents from Mexico. His father and mother, along with his older siblings, arrived from Jalisco in the 1980s. Mr. Flores' parents have not spoken much to him about their lives in Mexico or why they chose to relocate to the United States. Mr. Flores has a general impression that his parents sought better work opportunities and a better lifestyle. This vague explanation, delivered rotely by either parent whenever Mr. Flores asked about their past, discouraged further inquiry. Mr. Flores' father, Jose Flores, found work as a cook at a juvenile hall in Sylmar. PSR¶74. His mother, Luz Marie Flores, cleaned houses and worked shifts at a chocolate factory. Mr. Flores does not know how his parents felt about their jobs. Or about any hardships his parents endured outside the family's apartment. In the years that Mr. Flores can recall, both parents were often absent.

Even when the parents were at the apartment, Mr. Flores did not feel a sense of being at home. Mr. Flores' father drank heavily. When Jose came home drunk, he sometimes beat Luz in front of Mr. Flores and the other children. PSR¶77 at n.8. Mr. Flores was five- or six-years-old when he saw his father slam his mother's head against a wall. Jose had been drinking. He was angry because dinner was served lukewarm. Mr. Flores recalls accompanying his mom to the emergency room and watching a doctor stitch together two sides of flesh on her head. This is one of Mr. Flores' earliest memories.

With time, Mr. Flores began prying his adolescent body between his drunk father and his crying mother. Mr. Flores sometimes pushed his father away. He was a boy standing between two adults, trying to stop the next blow.

Luz did not offer her son the same protection. She punished Mr. Flores often, sometimes for things he had done, and other times for things he had not. She hit all five children with a belt, but struck Mr. Flores the most. PSR¶77. Discipline was not missing. There was plenty of that. What was missing was concern, direction. Jose and Luz did not ask Mr. Flores why he began to act out. No one asked what Mr. Flores was experiencing or what he feared. Mr. Flores did not feel loved or understood by his parents. Jose and Luz did not talk to each other about their feelings. They did not ask their children about feelings. Mr. Flores and his siblings learned, instead, to live in relative silence around the violence.

Mr. Flores knew home was a lonely place where his father might come through the door drunk. Where his mother might be beaten. Where a belt might be pulled from a drawer. Where the adults showed no apparent care about how all this volatility would necessarily impact Mr. Flores as a child, a teenager, and a man. Mr. Flores grew up with a roof over his head but he did not have a home where he could feel safe.

**2. Mr. Flores Developed a Drug Addiction While Seeking Guidance and Belonging in the Neighbourhood Gang at Age Thirteen**

Mr. Flores looked outside the apartment for things a child typically receives in a home: instruction, recognition, and a sense of belonging. The family lived in what the Probation Office knows to be "a gang entrenched apartment complex in the projects." PSR¶76. Ordinary neighbourhood life and gang activity were intertwined. Naturally, this meant that Mr. Flores' neighbours, classmates, friends, and his friends' older siblings and cousins, were involved in gang life.

At age thirteen, Mr. Flores joined Pacoima Trece, the neighbourhood gang. PSR¶78. Mr. Flores lacked a critical perspective on the gang to prison pipeline. Yes, Mr. Flores saw other gang members get arrested and serve time for crimes. But for a thirteen-year-old boy, future consequences are easily overlooked. Judgment, impulse control and the assessment of long-term consequences would not neurologically mature until Mr. Flores' mid-twenties.

What Mr. Flores experienced in the meantime was something more immediate and potent: the attention of older boys. They were Big Homies (older than Mr. Flores, but many still kids). They took an interest in him. To a boy growing up in an unstable family, the attention filled a void where paternal care was painfully absent. The Big Homies, too, were products of families and circumstances where volatility was ordinary. A sense of home rooted.

When an older kid, a Big Homie, told Mr. Flores to smoke crack with him, Mr. Flores followed. There was negligible parental supervision and no mature weighing of consequences. There was the neighbourhood, the need to belong, and a thirteen-year-old following an older kid who he admired and wanted to impress. Mr. Flores was shepherded into addiction.

### 3. Mr. Flores Took Responsibility for Crimes He Committed Throughout His Teens and Early Twenties

It is no coincidence that Mr. Flores began picking up criminal cases at age thirteen. Yet despite his misdeeds, Mr. Flores was consistently honest about his crimes to law enforcement and the courts. During his first arrest in 1997 for breaking into an apartment, Mr. Flores admitted to police that he had recently started using crack. PSR¶45. Luz told police that her son had a drug problem, too. *Id.* That same year, Mr. Flores was arrested for breaking a car window and admitted to police that he was attempting to steal a CD player to sell for food. PSR¶46. At age 16, Mr. Flores was arrested for receiving stolen property and admitted to police that he stole a lug nut from the car. PSR¶49. During a traffic stop at age 19, Mr. Flores admitted to police that he was a gang member. PSR¶50. At age 19, Mr. Flores admitted to police that he was high on crack, which resulted in a conviction for being under the influence of a controlled substance. PSR¶51. At age 20, Mr. Flores received a couple of convictions for personal use narcotics possession that he did not challenge. PSR¶¶52-53. At age 21, Mr. Flores pled no contest to his most serious offense, assault with a deadly weapon

(non-firearm), for a violent incident involving his sister, Jessica Flores. PSR¶¶54-55. Mr. Flores and Jessica were mired in addiction at that time.

Mr. Flores acted in ways he deeply regrets. He did not hide his desperate need for help. It was palpable. He wore it on his sleeve, acting without tools to pause and process. Finally, the brakes set when Mr. Flores spent over three years in prison for the incident involving Jessica. Up until that point, Mr. Flores consistently took responsibility for his crimes in the procedural sense (be truthful, admit wrongdoing, serve sentence). In prison, he learned accountability.

**4. Mr. Flores Reformed in Prison and Stayed Out-of-Custody for Sixteen Years Until His Arrest in This Case**

Prison was a dividing line in Mr. Flores' life. On one side was a boy who had acted without regard for consequence. On the other side was the young man who was learning that he creates his consequences. Age played a role. Prison programming played a role. As did watching the endgame for inmates who did not seek change. Mr. Flores became less concerned with himself and recognized that his crimes hurt others. He felt remorse, especially towards his sister Jessica. In June 2009, Mr. Flores paroled at age twenty-five.

**a. Mr. Flores Apologized To His Sister Jessica and Became a Dependable Support to Her**

Mr. Flores' top priority when released was to tell Jessica how deeply he regretted his actions. This was a difficult, personal conversation. Mr. Flores tried, unsuccessfully, to persuade Jessica to move in with him and his parents and seek drug treatment. Mr. Flores, too, was still reckoning with his own addiction, but he was functioning better than Jessica. She was not ready for treatment. Rather than caving to the childhood instinct to turn inward, Mr. Flores supported Jessica how he could. He helped her with childcare and became a brother whose actions were dependable.

**b. Mr. Flores is a Loving Father to Three Kids**

There was another realization: Mr. Flores saw that he was responsible for creating the family connection he desired. Mr. Flores entered a serious relationship with Adriana Morales, to whom he is now engaged, and began raising her two children, Ernest and Kristen, as his own. He potty-trained Ernest. He dressed the children. He took Kristen to school. He organized trips to the park. He was there for the ordinary work of raising children, and, for the first time, life felt meaningful.

On June 27, 2010, Adriana and Mr. Flores' daughter, Alyahna, was born. Mr. Flores describes his daughter as the person who makes his life worth living. PSR¶88. As Mr. Flores' sister Blanca Flores writes: "Since he had his daughter he has changed into an amazing brother, father and stepfather and now the godfather to my daughter." Exhibit G. Likewise, Mr. Flores' sister Marisol Flores observes: "Fernando has been such an immense help and source of support for our entire family. He is an amazing father to his three children, Alaina [Alyahna], Ernest and Kristen. He is present in their lives every day, guiding them, teaching them right from wrong, and showing them unconditional love." **Exhibit H**. Mr. Flores' daughter, Alyahna, explains in her letter that Mr. Flores is loving and supports her through difficult times, including when she struggles with mental health. **Exhibit I**. Mr. Flores remains an intensely hands-on father to Alyahna, Ernest and Kristen. Family is Mr. Flores' most significant deterrent to reoffending.

//

Flores with his daughter Alyahna










Flores with his three kids, Ernest, Kristen, and Alyahna



Flores and Alyahna at her 16th Birthday




Flores with his niece/Goddaughter



Flores with his mom and sisters

### c. Mr. Flores Learned Healthy Communication Skills From Treatment and Takes Care of His Entire Family and Community

In 2010, Mr. Flores participated in inpatient and outpatient treatment for six months at Walden House. There, Mr. Flores developed perspective to better understand his past. Weekly conversations with his counselor, Erik Barnes, helped Mr. Flores to develop skills to communicate what he had previously kept to himself and to regulate his actions. He initiated difficult conversations with his parents about the neglect he experienced as a child. Luz could not explain why she had been emotionally distant. She did not suddenly become the nurturing mother Mr. Flores needed as a child. Yet Mr. Flores persisted. He stopped waiting for his parents to become different people. Mr. Flores helped around the house. He drove Luz, who is diabetic, to medical appointments. He worked and helped to cover his parents' living expenses. Mr. Flores' parents still do not speak easily about their feelings, either to him or to one another. That part has not changed. But the household became calmer. There is respect where there had once been resentment.

As Mr. Flores' dad, Jose Flores, writes, "I am Fernando Flores' father, I love him very much and depend on him a lot." **Exhibit J**.[6] Jose explains that he is sixty-seven-years-old and depends on Mr. Flores for medical appointments and other caretaking. Mr. Flores' mom, Luz, similarly explains in her letter: "Fernando is the one who takes care of me and gives me my medicines. He is my greatest help and I don't know what I would do without him." **Exhibit K**.[7] As Blanca observes, "My parents are nothing without Fernando, they are seniors already and they need a lot of help. Fernando takes

---

[6] This is an English translation of Jose Flores' written letter in Spanish. The letter and translation are collectively appended as Exhibit J.

[7] This is an English translation of Luz Flores' written letter in Spanish. The letter and translation are collectively appended as Exhibit K.

them to doctor appointments, makes them [appointments] for them, and drives them now. He runs errands for them and helps them so much." Exhibit G.

Mr. Flores also helps his sisters, friends, and community. Blanca explains in her letter that Mr. Flores routinely takes care of her three children and Jessica's baby, Noah, so that Blanca can have parenting breaks. Exhibit G. Marisol Flores describes Mr. Flores as a "father figure" to her two children, Joshua and Anthony. Exhibit H. Mr. Flores' friend of seven years, Jeremiah Tabor, writes: "Fernando has consistently been there for me and my family whenever we need help. Whether it was helping with transportation, assisting with household projects, offering support during difficult times, or simply showing up when he need someone, he has always stepped in without hesitation." **Exhibit L**. Mr. Flores also helps out his neighbours in the community by cutting their gras and running errands. Mr. Flores' cousin, Tomas Flores, observes that since Mr. Flores' release from prison, he got to know Mr. Flores "on a much deeper level" and is "very impressed by the growth, wisdom, and sense of responsibility that he had developed since his last incarceration." **Exhibit M**. While in the community for the past sixteen years, Mr. Flores has prioritized caring for his family, friends and neighbours above all else.

#### d. Mr. Flores Has Held Consistent Employment Since His Release From Prison

Since his release from prison, Mr. Flores has consistently worked to provide for his family. Since 2009, Mr. Flores has loaded pallets at Associated Recycling Pallets. Exhibit F. He has also operated a forklift at Arrow in Los Angeles, LA Galvanizing in Vernon, Southland Box in Vernon, and, currently, at Glovis America. PSR¶¶109-113. Mr. Flores' work is a major stabilizing factor that has curbed recidivism.

### 5. The Offense is Aberrant to Mr. Flores' Character and the Conduct Was Relatively Minor

The charged incident is aberrant to the law-abiding, thoughtful character Mr. Flores has cultivated over the past sixteen years. The offense, captured on A.M.'s

cellphone video, is relatively minor. *See* Exhibit B. On July 23, 2025, Mr. Flores did what he had done on several other days that summer--he attended a protest against ICE's enforcement operations in Los Angeles. He carried no weapon. He protested on a public sidewalk near the Metropolitan Detention Center ("MDC"). A.M. and her coworkers walked on the road from their shift at MDC to the parking lot. Mr. Flores mistook the group for ICE officers and walked up to them. A.M.'s female coworker walked past Mr. Flores without incident. Mr. Flores said something like to the group like, "You work for these motherfuckers you bitch," referring to ICE. For about one second, Mr. Flores grabbed A.M.'s backpack, which was strapped to A.M.'s back, causing her to step back. Mr. Flores cursed, and A.M. continued walking to the parking lot with her coworkers. After the conduct, federal officers arrested Mr. Flores, took him to the ground, and dragged his body away in front of protestors.

For this split-second contact, Mr. Flores was charged with felony assault on a federal officer in violation of 18 U.S.C. § 111(a)(1). He was arrested that evening and spent five days in jail. Two of those days occurred after his release was ordered on Friday, July 25, 2026, due to the weekend. Dkt. 5. Mr. Flores ultimately pled guilty to misdemeanor assault on an officer.





### 6. Mr. Flores is Remorseful and Demonstrated Significant Insight Into His Offense Conduct

Other defendants in Mr. Flores' shoes may have reasonably elected to try and beat the case at trial. Afterall, Mr. Flores already bears the stigma of a criminal history and the bag pull is not a forgone conclusion from the incident video. But consistent with his run-ins with the law since a youth, Mr. Flores admitted to his wrongdoing. He entered a guilty plea. What is different about this offense is it is aberrant to the character Mr. Flores has worked so hard to build since leaving prison sixteen years ago. Also different is Mr. Flores' ability to express why his behavior was wrong, how it hurt another person, and what he should have done different.

This insight is evident in Mr. Flores' apology letter to A.M., appended as **Exhibit N**. Mr. Flores wrote, in part:

> You were just doing your job, and I made you feel scared and disrespected in a moment when you should have felt safe... I let anger take over instead of walking away. That is on me, and being angry gave me no right to od that to you. I am sorry. There is no excuse for how I acted.
>
> I can't change what I did. What I can do is be different. The next time I am angry or hurt, I have to make a different choice--walk away, cool off, call someone I trust--before I ever put that on another person again. That is the promise I am making.

Mr. Flores' mistaken belief that A.M. was an ICE agent does not excuse his conduct, but it does lend important context. Human Rights Watch found evidence that during the June 2025 ICE protests in Los Angeles, federal officers committed "clear violations of international human rights law," violated civil rights protections under the United States Constitution, and violated California state law which includes restrictions on how and when law enforcement may use force to disperse protests.[8] As Human Rights Watch documented:

---

[8] Human Rights Watch, "US: Excessive Force Against LA Protestors" (Aug. 18, 2025), available at https://www.hrw.org/news/2025/08/18/us-excessive-force-against-la-protesters.

> Officers fired tear gas, pepper balls, hard foam rounds, and flash-bang grenades directly at protesters, journalists, and other observers, often at close range and often without sufficient warning or provocation. Scores of people suffered injuries, ranging from severe bruising and lacerations to broken bones, concussions, an amputated finger, and severe eye damage. *Id.*

Mr. Flores protested in crowds where these atrocities took place. Mr. Flores now understands that he erred in putting himself in a uniquely volatile setting where his judgment was overwhelmed. He has talked with his counsellor about the conduct and the importance of tempering passion with careful scrutiny. Mr. Flores is not a vengeful person. He has not minimized his wrongdoing. He is ready to face the consequences.

**7. Mr. Flores Still Receives Mental Health and Relapse Prevention Therapy**

Mr. Flores has continued speaking weekly with his counselor Erik Barnes since 2010. PSR¶¶98. Mr. Flores also receives weekly mental health and relapse prevention counselling from Jacob Reyes at AADAP, the outpatient program he completed in August 2026. Mr. Flores chose to stay in that program longer until he knew he could cope with his sister Jessica's tragic death without relapse. Exhibit D. As such, Mr. Flores already has put in place mental health and relapse prevention resources. No further court supervision is needed to develop these resources.

**8. Parity With Other Cases**

Other protestor cases in this district offer a more appropriate point of comparison for sentencing parity than the JSIN data. In *Hector Galeano-Galindo*, 2:25-cr-00660-AH, for instance, a defendant assaulted a federal officer by striking down the officer's arms as the officer tried to clear a path for an ICE vehicle exiting the MDC loading dock. A time served sentence was imposed. The conduct in *Galeano-Galindo* was more aggravating since it involved bodily contact. Here, Mr. Flores did not physically touch the victim's person.

Meanwhile, probation was granted in protestor cases in this district where the offense conduct was more serious. In *Jose Cervantes Licea*, 2:25-cr-00602-MWC, the defendant lowered his shoulder to make contact with a federal agent's arms. As the agent absorbed the contact, the defendant grabbed the agent's arms in an effort to pry a target away from the agent. In the midst of that struggle, the target ran away. One year of probation was ordered. Dkt. 50. In *Thomas Guzman*, 2:25-cr-00543-FMO, the defendant threw a rock at a CBP Officer's head, striking the officer's plexiglass face shield covering in the eyes/nose area, and received probation. Here, Mr. Flores did not throw dangerous objects at A.M. Nor did he make physical contact with an agent's person to obstruct a detention. As such, this case is less serious than other protestor cases in this district where probation was ordered.

**9. The Appropriate Sentence**

The arrest, prosecution, conviction, and five days of jail time is sufficient but not greater than necessary. The offense conduct, a bag pull resulting in no injury, was minor. It was an aberration of who Mr. Flores has become over the past sixteen years since his release from prison. For the past fifteen months, Mr. Flores has been subject to monitoring from Pretrial Services. During this period, he did not engage in any acts of violence or pick up new arrests. He completed inpatient and outpatient substance abuse treatment to address his two positive drug tests. He continues to receive mental health treatment. His resolve to stay sober was tested during his sister's tragic death in July of this year. Mr. Flores sought support and remains on a good path. He works fulltime and supports his family.

Any further sanction, such as the Probation Office's recommended three month custodial sentence, is unnecessary and may destabilize Mr. Flores, who would stand to lose his current job. A job that pays well and allows him to support his family. The 2025 version of the Guidelines no longer recommends that the Court reflexively impose supervision. Instead, a term of supervision should only be imposed "when warranted by an individualized assessment of the need for supervision," U.S.S.G. § 5D1.1(b), and

a consideration of the factors in 18 U.S.C. § 3553(a), U.S.S.G. § 5B1.1 n.3. Mr. Flores addressed his addiction with treatment that just ended last month and has a relapse prevention plan. He does not pose a risk to himself or to society. Placing him on supervision is unnecessary.

A fine is unjustifiable, as the PSR demonstrates that Mr. Flores does not have the ability to pay a fine. PSR¶120. A fine would impose an unreasonable burden on Mr. Flores, his daughter, and other family members he supports. *See* 18 U.S.C. § 3572(a) (directing the court to consider, when imposing a fine, "the defendant's income, earning capacity, and financial resources," "the burden that the fine will impose upon the defendant [and] any person who is financially dependent on the defendant"). A fine is particularly unwarranted given that there is no "pecuniary loss" caused by the offense, no ill-gotten gains by Mr. Flores, and no expected costs to the government for imprisonment, supervised release, or probation. *Id.* § 3572(a)(3)-(6). Further, a fine could be detrimental to Mr. Flores' ability to make restitution, if any is sought. *Id.* at 3572(b).

## III. CONCLUSION

The defense requests a time served sentence with no supervised release to follow.

Respectfully submitted,

AMY KARLIN
Interim Federal Public Defender

DATED: September 9, 2026 By */s/ Melissa Austen*

MELISSA AUSTEN
Deputy Federal Public Defender
Attorney for FERNANDO FLORES

# Exhibit A

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Criminal Division**

**Torrance Dept. - 3**

**SBA1TR01440-01** **May 26, 2026**

**The People of the State of California** **8:30 AM**
**vs.**
**FLORES, FERNANDO**

Honorable Brad Miles Fox, Commissioner
M. Arreola, Judicial Assistant

Proceedings Electronically Recorded, Court Reporter

---

VC14601.1(a), VC12500(a)

**NATURE OF PROCEEDINGS:** Bench Warrant Hearing
Stipulated that Commissioner Brad Miles Fox may hear the cause as Temporary Judge.

The following parties are present for the aforementioned proceeding:

FERNANDO FLORES, Defendant
Richard Eric Josefson, Hermosa Beach Deputy City Prosecutor

---

The matter is called for Bench Warrant Hearing.

Bench warrant is recalled and quashed.

The People's motion to dismiss pursuant to Penal Code section 1385 is heard and granted.

Disposition as to Count 001, VC14601.1(a), Misdemeanor: Dismissed 1385 PC

Disposition as to Count 002, VC12500(a), Misdemeanor: Dismissed 1385 PC

Minute order is prepared by C. Sedeno on May 27, 2026.

# Exhibit B
# (Video)

# Exhibit C

**CANON HUMAN SERVICES CENTERS, INC.**
**246 ½ E. 118th St.**
**LOS ANGELES, CA 90061**
***Tel: (323) 451-3080***

November 28, 2025

Re: Mr Fernando Flores

# LETTER OF COMPLETION

To Whom It May Concern,

This letter serves as formal documentation that Mr. Fernando Flores has successfully completed Substance Use Disorder (SUD) treatment at the Outpatient Level 1.0 Program at Canon Human Services.

Throughout the course of his 90-day treatment episode, Mr. Flores consistently attended and actively participated in all required group sessions, demonstrating responsibility, cooperation, and steady engagement in the recovery process. His participation included group counseling, relapse prevention education, cognitive-behavioral skill-building, and recovery-focused discussions relevant to his treatment plan. In addition, Mr. Flores successfully fulfilled his requirement to attend Alcoholics Anonymous (AA) meetings, showing commitment to maintaining sobriety and building a supportive recovery network. He remained compliant with all program expectations and maintained appropriate conduct throughout his treatment involvement.

As his counselor, I have observed meaningful effort and positive progress in Mr. Flores. He demonstrated consistency, willingness to participate, and dedication to completing the program successfully. At the time of discharge, Mr. Flores expressed that he does not wish to continue with further treatment services.

It is with great pleasure that I acknowledge and commend Mr. Flores for his successful completion of the Outpatient Level 1.0 Program. If any additional information is required, please feel free to contact me at the number listed above.

**Sincerely,**
*Walter Raudales*

# CANON HUMAN SERVICES CENTERS, INC.

THIS CERTIFIES THAT

# FERNANDO FLORES

Has completed our Level 1.0 intensive Outpatient Treatment Program
on this 25th day of November, 2025

*Dr. Richard Harrison, PH.D., SUDCC IV #7559*

*Jessica Serrano, Registered SUD Counselor*
#R147850822

Canon Human Services Centers, Inc.
246 ½ E. 118th St
Los Angeles, Ca. 90061
(323) 451-3080

© 2021 Great Papers

# Exhibit D

AADAP

**8/20/26**
**To: Federal Public Defender, Melissa Austen,**
**Re: Completion letter for client Fernando Flores**

This is a completion letter for client Fernando Flores (DOB 7/8/1984). Mr. Flores enrolled in the Asian American Drug Abuse Program (AADAP) on 4/27/2026 in our outpatient program. Client's treatment schedule has consisted of 3 substance use disorder (SUD) groups per week, weekly individual sessions with primary counselor and weekly, random Urine Analysis (UA) test. At the time of writing of this report, client has participated in 55 SUD groups, has engaged in 21 Individual sessions with primary counselor and submitted to 13 UA tests, where client continues to maintain negative UA test results, which show he is maintaining ongoing sobriety.

Client has engaged openly in SUD treatment, evidenced by client maintaining his presence in both in person and online SUD groups. Client continues to strengthen and fully develop his relapse prevention plan, which involves gaining coping mechanisms that he can utilize to manage any life stressors in positive manner. Furthermore, client has shown strong resilience and commitment to his sobriety in light of recent family tragedy he had to deal with. Given his continued progress in outpatient program, counselor's clinical judgment is to grant client successful completion of outpatient treatment. Client is also eligible to stay connected to treatment via after care services, which is part of recovery support services, which is a voluntary option client has available to him. For any further questions or concerns, feel free to reach out to client's primary counselor Jacob Reyes, at (323)294-4932 or at jreyes@aadapinc.org

Thank you,

Jacob Reyes, Outpatient counselor, BA, CADCIII-CA
Asian American Drug Abuse program
(323) 294-4932
jreyes@aadapinc.org

# Exhibit E

Watch Live

# Mother of 5 killed by suspected drunk driver in Pacoima crash

**By** Gigi Graciette FOX 11 Pacoima **Published** July 8, 2026 7:06 AM PDT

**Mother of 5 hit and killed by suspected drunk driver in Pacoima**

The 33-year-old driver was arrested at the scene on suspicion of driving under the influence.

---

**The Brief**

- Jessica Flores, 37, was struck and killed by a suspected DUI driver in Pacoima on Tuesd night.
- The 33-year-old driver was arrested at the scene on suspicion of driving under the influence.
- Flores, who was homeless and living in a nearby trailer, leaves behind five children, including a baby turning four months old on Thursday.

---

**PACOIMA, Calif.** - A mother of five was killed Tuesday night after being struck a suspected DUI driver while crossing a street in Pacoima.

Jessica Flores was pronounced dead at the scene, leaving her family and community devastated by a tragedy officials say was entirely preventable.

What we know: The incident happened around 9 p.m. on Branford Street, near Laurel Canyon Boulevard, in a dark, industrial section of Pacoim according to police.

Flores and her boyfriend were attempting to cross the street outside a marked crosswalk when an oncoming vehicle struck her. The impact killed Flores instar her boyfriend was not injured.

The driver of the vehicle, a 33-year-old man, was arrested at the scene on suspicion of driving under the influence.

According to her family, Flores was a good woman who had fallen on incredibly difficult times.

She was homeless and had been living in a trailer parked down the street for about four months, her family said.

While she did not have custody of her five children—the oldest being 22 and th youngest turning four months old on Thursday —her children loved her deeply

Family members gathered at the scene throughout the morning to mourn her loss.

What we don't know: The identity of the 33-year-old driver has not yet been released by law enforcement.

It is also unclear what specific charges he will face beyond the initial DUI arrest, when his first court appearance will be scheduled.

What's next: The investigation into the collision remains ongoing by local authorities.

What you can do: A GoFundMe campaign has been created to help Flores's family. To learn more, tap or click here.

**The Source:** This report is based on direct interviews with law enforcement investigators at the scene and personal accounts from Jessica Flores's family members.

**Pacoima** **Crime and Public Safety**

This material may not be published, broadcast, rewritten, or redistributed. ©2026 FOX Television Stations

# Exhibit F

**From:** Fernando Flores
**To:** Breeanna Bellinger
**Subject:** Fwd: Fernando Flores
**Date:** Wednesday, February 18, 2026 3:40:31 PM

EXTERNAL SENDER

---------- Forwarded message ---------
From: **Daniel Gomez** <[redacted]>
Date: Tue, Feb 17, 2026 at 5:35 PM
Subject: Fernando Flores
To: <[redacted]>

To Whom It May Concern,

This letter is to confirm that Fernando Flores has been working with Associated Recycling Pallets since 2009. He was originally hired by my father, Jose Gomez , and has been a dependable and hardworking individual throughout his time with us.

Fernando assists with pallet yard operations primarily on weekends. His responsibilities include sorting pallets, organizing inventory, assisting with loading and unloading, and maintaining general yard cleanliness and order. He has consistently demonstrated a strong work ethic, reliability, and a respectful attitude.

Over the years, Fernando has proven himself to be trustworthy and committed. He has been an important part of our operations, and we value the effort and dedication he brings to the job.

If you require any additional information, please feel free to contact me at any time.

Best regards,

**Associated Recycling Pallets**

[redacted]

# Exhibit G

To whom it may concern,

Hello there my name is Blanca Flores and I am 32 years old and I am Fernando Flores baby sister. I can tell you so much about Fernando, he has been my #1 person I can count on for anything! I suffered a lot of sadness when he use to be in prison and now that he has been out for 15-16 years since he had his daughter he has changed into an amazing brother, father and step father and now the god father to my daughter. And soon to be the god father to my baby nephew who I am now getting custody of. It matters so much to the family if you keep him in custody we rely so much on him and need him home. He helps me so much with my kids I have 3 now and he helps me with them because he says I need time to myself and to me thats a huge help. My parents are nothing without Fernando, They are seniors already they need a lot of help Fernando takes them to doctor appoitments makes them for them and drives them now. He runs errands for them and helps them

so much. We lost one of our brothers 3 years ago going on 4 and on July 7, 2026 we lost our sister a day before Fernando's birthday so we are griving really bad and now more than ever want to keep the only 4 brothers and sisters that are left more united than ever. Fernando is a huge help with all my kids my daughter cried so much when he got detained it affects her a lot She loves him so much we all do. As for my baby nephew who I am getting custody of which is my sister's baby whom passed away he loves his uncle Fernando even before my sisters passing the baby has a great connection with his uncle Fernando. I am so greatful to have Fernando in our life and will bring so so so much sadness to see him behind bars. He is the one who keeps us moving foward all the time. We are nothing without him.

Sincerely
Blanca Flores
[redacted]

# Exhibit H

**From:** Fernando Flores
**To:** Breeanna Bellinger
**Subject:** Letter from my sister
**Date:** Monday, March 2, 2026 5:16:40 PM

EXTERNAL SENDER

Marisol Flores

[redacted]

Pacoima, CA [redacted]

March 1, 2026

Re: Character Letter for Fernando Flores

Dear Your Honor,

My name is Marisol Flores, and I am writing this letter on behalf of my brother, Fernando Flores. I have known him my entire life, and I can confidently say that he has always been a loving, supportive, and hardworking person who deeply cares about his family.

Fernando has been such an immense help and source of support for our entire family. He is an amazing father to his three children, Alaina, Ernest, and Kristen. He is present in their lives every day, guiding them, teaching them right from wrong, and showing them unconditional love. He is also a devoted and loving husband to his wife, Adriana. Their family is built on love, commitment, and support.

His children would be terribly affected by his absence. They rely on him not only financially but emotionally. He is their protector, their role model, and their biggest supporter. In addition, Fernando has been a tremendous help with my own children, Joshua and Anthony. He has been somewhat of a father figure to them, always stepping in to guide, support, and encourage them whenever needed.

All my life, Fernando has been supportive and helpful to me. I have personally witnessed the positive changes he has made. He has truly been working on turning his life around, and the growth and change

within our family has been amazing to see. He is committed to continuing that progress and being the best father, husband, brother, and role model, he can be.

I respectfully ask the Court to consider his character, his dedication to his family, and the positive impact he has on those around him when making your decision.

Thank you for your time and consideration.

Respectfully,

Marisol Flores

# Exhibit I

Dear Your Honor,

My name is Alyahna Flores, and I am 15 years old. I am writing to the court as my father's daughter to respectfully share my perspective.

Ever since I was little, I have always been very close to my dad, and it has always been hard for me to be apart from him. He has been a loving and supportive father who encourages me to do well in life and make good choices.

Since I was 12 years old, I have struggled with my mental health. During those difficult times, my dad has supported me and helped me manage my anxiety when I feel nervous or overwhelmed.

On July 27, 2025, my dad missed my 15th birthday because of his arrest. He had never missed one of my birthdays before, so it was very difficult for me and my family not having him there. I remember crying most of the day because it was so hard without him. That experience showed me how much his absence affects our family.

I truly believe my dad is trying to take responsibility for his actions and become a better person. His presence in my life means a lot to me, and this situation has been very difficult for both me and my family.

I respectfully ask the court to please consider the impact this situation has on me as his daughter.

Thank you for taking the time to read my letter.

Sincerely,

Alyahna Flores

# Exhibit J

Hola mi Nombre es
Jose FLORES y soy el papa
de Fernando FLORES yo lo quiero
mucho y dependo mucho en el
yo tengo 67 años yo ya
Tengo muchas diticultades
y dependo mucho er Fernado El
me cuida y me ase todos mis mandos
Como aserme citas al doctor
Tambien llevorme mi ~~s~~ Vistas ya no
~~?~~ estoy muy bueno y lo necesito
mucho yo sin el no puedo
aser nada y ya no puedo

Nicaminar

y stoy
Latimedo
de mies palda

Hello my name is

José Flores and I am Fernando Flores' father, I love him very much and depend on him a lot. I am 67 years old. I already have a lot of difficulties and I depend a lot on Fernando. He takes care of me and makes me all my commands like making my appointments to the doctor. Also taking me to my sights I'm not very good anymore and I need it very much without him I can't do anything and I can't even walk anymore and I'm hurt in my back.

# Exhibit K

Hola mi nombre es
Luz Flores. Soy la mama
de Fernando Flores Ya perdi
a mi hijo y hija y me
va doler mas ver a Fernando
en la carcel es mucho dolor
para una madre mi corazon
se rompe en pedazos cada dia
mas yo ya estoy grande Tengo
Ten el diabetes muy mal mi
vista seme va y Tengo mucho
dolor en mis pies Fernando es
el que me cuida y me da -

mis medicinas. El es mi
ayuda mas grande y nose
que aria sin el. El es ~~[illegible]~~
~~[illegible]~~ un buen Trabador, ~~Respon~~
respeToso y se dedica a
Toda la familia es un buen
hijo/padre/Tio/padrino/y
hermano El siepre esTa
muy aTento. de Todo PorFabor
no le den
Tienpo va ser otro. sufrimieto
mas Para mi y yo sienTo que
yano voy a Poder. porfabor
perdonelo. ATenTamenTe
Luz Flores

Hello, my name is Luz Flores. I am the mother of Fernando Flores and I lost my son and daughter and it will hurt me more to see Fernando in jail is a lot of pain. For a mother my heart breaks into pieces every day more and more I am already grown up I have very bad diabetes. My eyesight is going away and I have a lot of pain in my feet. Fernando is the one who takes care of me and gives me my medicines. He is my greatest help and I don't know what I would do without him. He is a good worker and respectful, and he is devoted to the whole family. He is a good son/father/uncle/godfather/and brother. He is always very attentive to everything. Please don't give time, it will be another suffering for me and I feel that I will no longer be able to do it. Please forgive him.

Attention,

Luz Flores

# Exhibit L

Dear Honorable Judge,

To whom it may concern.

My name is Jeremiah Tabor, and I am writing this letter in support of Fernando Flores. I have known him for about 7 years now and during that time I have come to know him as a kind, dependable, and genuinely caring person.

Fernando has consistently been there for me and my family whenever we have needed help. Whether it was helping with transportation, assisting with household projects, offering support during difficult times, or simply showing up when we needed someone, he has always stepped in without hesitation. That kind of reliability and generosity is rare, and it speaks to his character.

Beyond being helpful, Fernando is a loyal friend and someone who truly values family and community. He treats people with respect and compassion and is always willing to lend a hand. I have personally seen how much he cares about doing the right thing and being there for others.

While I understand that everyone can make mistakes, I believe this situation does not define who Fernando is as a person. From my experience, he is someone who strives to be better and to support those around him. I sincerely believe that he has a good heart and a strong character.

Thank you for taking the time to read my letter and consider my perspective.

Sincerely,

Jeremiah Tabor

# Exhibit M

To Whom It May Concern,

My name is Tomas Flores, and I am the cousin of Fernando Flores. I grew up watching my cousin during our childhood in Pacoima, where he would often visit my family. After moving away from the neighborhood due to unforeseen circumstances, we unfortunately lost contact around 2011. It wasn't until 2017, when I was in college, that we reconnected.

Even during the years we weren't in touch, I carried the values and principles I had learned from observing Fernando. As a young man, I admired how respectful and upright he was, and those lessons helped shape me throughout my teenage years and into adulthood.

When I graduated and returned home in 2020, Fernando began inviting me to family gatherings and carne asadas. During those times, I got to know him on a much deeper level. I was very impressed by the growth, wisdom, and sense of responsibility he had developed since his last incarceration. Fernando has become an incredibly positive influence, a devoted family man who leads with love and humility.

I couldn't be prouder to call him my cousin. He has taught me so much, not only through conversation but through his actions, always putting family and friends before himself, even when he doesn't receive the same gratitude he deserves. His kindness and selflessness truly stand out.

Incarcerating Fernando again would be a tremendous loss to our family. He is the glue that keeps us all connected, the one who brings us together, makes sure we're fed, and reminds us that family and love come first.

Sincerely,
Tomas Flores

# Exhibit N

Dear Ms. A.M.,

My name is Fernando Flores.
I am writing to tell you I am sorry for what I did on July 23, 2025

You were leaving your job and heading home after your shift. You didn't do anything to me. I cursed at you, I grabbed your backpack, and I called you a name I never should have called you. That was wrong. You were just doing your job, and I made you feel scared and disrespected in a moment when you should have felt safe. I was angry that night. I was protesting against the ICE raids. My heart was broken over seeing families ripped apart by the raids. I mistook you for an ICE Officer. I let anger take over instead of walking away. That is on me, and being angry gave me no right to do that to you. I am sorry. There is no excuse for how I acted.

I can't change what I did. What I can do is be different. The next time I am angry or hurt, I have to make a different choice – walk away, cool off, call someone I trust – before I ever put that on another person again. That is the promise I am making.

I have thought about that night a lot since then. I got out of prison in 2009, and I promised myself I would never go back. I still carry my old prison ID with me everywhere I go, to remind myself of where I was and where I never want to end up again. That night, I forgot the man I have been working so hard to be. I have been getting help. I finished a substance abuse program, and I am still working hard on my sobriety. I do it for my parents, who I take care of, and for my kids.

Something also happened recently that changed me. My sister Jessica was killed by a drunk driver while she was crossing the street. She was homeless and fighting her addiction, and I wish I could have helped her more than I did. Losing her showed me how fast one moment can take away something a whole family can never get back. Those choices don't come with a do-over. I don't ever want to be the reason another family feels that kind of pain.

I am not writing this because I think I am owed your forgiveness. I'm not and I do not expect to receive it. I just needed you to hear that I know I was wrong. I know you have a hard job and I respect you for doing it.

I am sorry I treated you that way. Everybody deserves to feel safe and respected doing their job and going home to their family – that is what I took from you that night, and it is what I am going to carry with me so I never do it to anyone again. I wish you health, happiness and safety.

Respectfully,
FERNANDO FLORES
[signature]

**PROOF OF SERVICE**

I, the undersigned declare, that I am a resident or employed in Los Angeles County, California; that my business address is the Office of the Federal Public Defender, 321 East 2nd Street, Los Angeles, California 90012-4202, Telephone No. (213) 894-2854; that I am over the age of eighteen years; that I am not a party to the action entitled above; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the State of California, and at whose direction I served a copy of the attached **DEFENDANT'S SENTENCING POSITION; EXHIBITS A-N** on the following individual(s) by:

| | | | |
|---|---|---|---|
| [ ] Placing same in a sealed envelope for collection and interoffice delivery addressed as follows: | [ ] Placing same in an envelope for hand delivery addressed as follows: | [ ] Placing same in a sealed envelope for collection and mailing via the United States Post Office addressed as follows: | [x ] Emailing same via email addressed as follows: |

Jessica Mendez
USPPSO
Roybal Federal Building
Los Angeles CA 90012
Jessica_Mendez@cacp.uscourts.gov

This proof of service is executed at Los Angeles, California, on September 9, 2026.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*Carmen Fernandez*

Carmen Fernandez